E-FILED
Tuesday, 28 August, 2018  04:00:34 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Danny Cavic,<br><br>      Plaintiffs,<br><br>v.<br><br><br>MAVEN ENGINEERING CORPORATION,<br>KAVITA DAWSON, AND<br>ROBINSON MFG., INC.<br><br>      Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | RELATOR DANNY CAVIC'S<br>ORIGINAL COMPLAINT<br><br><br><br><br>**FILED UNDER SEAL**<br>PURSUANT TO 31 U.S.C. §<br>3730(b)(2)<br><br><br>JURY TRIAL DEMANDED |

## **RELATOR DANNY CAVIC'S**
## **ORIGINAL COMPLAINT**

**TABLE OF CONTENTS**

I.      Introduction to Case ............................................................................................1
II.     Jurisdiction and Venue.........................................................................................4
III.    Original Source ....................................................................................................5
IV.     Parties...................................................................................................................6
        A.      Relator Danny Cavic...................................................................................6
        B.      Defendants ..................................................................................................8
                1.      Maven Engineering Corporation...................................................8
                2.      Kavita Dawson.............................................................................10
                3.      Robinson MFG., Inc ....................................................................10
V.      Respondeat Superior and Vicarious Liability ....................................................11
VI.     Statutory, Regulatory, and Contractual Requirements ......................................11
        A.      Overview of the DoD and the DLA...........................................................11
        B.      Federal Regulations Governing the Acquisition of Supplies.....................12
        C.      Material Contractual Requirements ...........................................................13
                1.      Compliance with Inspection/Testing Protocols and Supply
                        Specifications..............................................................................13
                2.      Place of Inspection and Acceptance Requirements .....................16
                3.      Certificate of Conformance.........................................................17
                4.      Material Inspection Report and Receiving Report (WAWF RR)..............18
                5.      Billing Requirements ..................................................................20
        D.      Buy American Act .....................................................................................21
                1.      Federal Law.................................................................................21
                2.      Federal Regulations ....................................................................22
                3.      Certifications...............................................................................24
VII.    Defendants' Scheme to Defraud the Government ..............................................25
VIII.   Actionable Conduct by Defendants ...................................................................37
        A.      The False Claims Act.................................................................................37
        B.      Defendants' Violations of the False Claims Act........................................38
                1.      Presentation of False or Fraudulent Claims: 31 U.S.C. §
                        3729(a)(1)(A)...............................................................................38
                2.      Making or Using False Records or Statements Material to False or
                        Fraudulent Claims: 31 U.S.C. § 3729(a)(1)(B)...........................41
                3.      Reverse False Claims: 31 U.S.C. § 3729(a)(1)(G) ......................43
                4.      Conspiracy: 31 U.S.C. § 3729(a)(1)(C) ......................................45
IX.     Causes of Action ...............................................................................................47
        Count I: Presentation of False or Fraudulent Claims under 31 U.S.C. §
                3729(a)(1)(A)...............................................................................47
        Count II: Making or Using False Records or Statements Material to False or
                Fraudulent Claims under 31 U.S.C. § 3729(a)(1)(B).....................49
        Count III: Reverse False Claims under 31 U.S.C. § 3729(a)(1)(G) .................50
        Count IV: Conspiracy under 31 U.S.C. § 3729(a)(1)(C)................................51
X.      Relief.................................................................................................................52
XI.     Prayer ................................................................................................................53
XII.    Demand for Jury Trial........................................................................................53

XIII.   Exhibits ................................................................................................................53

CERTIFICATE OF SERVICE ...............................................................................................55

1.      Plaintiff/Relator Danny Cavic ("Cavic" or "Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. § 3729–3732, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on his own behalf. Relator submits this Original Complaint and would respectfully show the following:

## I.    INTRODUCTION TO CASE

2.      Maven Engineering Corporation ("Maven") supplies complex machined parts to the railroad, defense, heavy industry, marine, and oil and gas industries. It has supplied the Department of Defense with spare parts for twenty-five years. Maven has engaged in a brazen parts laundering scheme for almost twenty of those years. Maven's government contracts require its military parts to comply with certain contractual specifications and that the parts be manufactured in the United States pursuant to the Made American Act. Instead of following the law, Maven has cheated the Government by importing substandard parts from Turkey and delivering them to the Government accompanied by a host of sham certifications.

3.      To perpetrate its scheme, Maven engaged a California mom-and-pop machine shop that was down on its luck—Robinson MFG., Inc. ("Robinson)—as a subcontractor to "manufacture" spare parts for Maven for use in military trucks, planes, and tanks, under Maven's contracts with the Government.

4.      Relator Danny Cavic ("Cavic") went to work for Robinson in February 2014. Because of his experience with manufacturing parts, knowledge of federal statutes, rules and regulations pertaining to the manufacture of parts, and experience dealing with Government DCMA inspectors, Relator was hired to be the Quality Manager for Robinson.

5.      Soon after joining Robinson, Relator discovered that Robinson was supplying to the Government—pursuant to Maven's supply contracts with the Department of Defense—substandard military parts that failed to meet the pertinent statutory, regulatory, and contractual requirements.

6.      Relator learned that Robinson and Maven were perpetrating an elaborate parts laundering enterprise, wherein Maven or Robinson purchased parts from Turkey with sham certifications, and then supplied these Turkish parts to the Government under various DoD contracts as though they met contract specifications, while representing that they were manufactured domestically. In fact, Robinson was not really "manufacturing" anything at all; it was delivering nonconforming foreign parts for military use, doing no more than occasionally adding a coat of paint. The parts were nonconforming because the faked certifications disguised common quality issues such as (1) dimensional problems (i.e., the parts would not fit in their intended machines because their dimensions differed from specifications); and (2) materials problems (i.e., the part was not composed of the specified metal mix to meets needs such as strength).

7.      Relator also saw that Maven's contracts expressly required that it comply with the Buy American Act. Yet Maven and Robinson were passing off the Turkish parts to the Government as being manufactured domestically. However, because Robinson rarely engaged in any "manufacturing" at all, Relator knew that Maven and Robinson statements and certifications to the Government were false.

8.      At the time of Cavic's hire, Robinson's parts had already been rejected by government inspectors multiple times for failure to conform the product specifications. Maven began pressuring Relator to find ways for the Government to accept the parts, even though

Maven knew that the parts failed to conform with contractual requirements applicable to the parts. Maven's president, Kavita Dawson, asked Relator to "clean" problems in foreign certifications that accompanied the Turkish parts to dupe the Government into accepting the non-compliant parts.

9.      Due to Maven's interference, Relator realized that it was Maven, not Robinson, that was the true driving force behind this fraudulent scheme to sell substandard and non-conforming parts to the Government. Relator learned that Robinson was simply retained as an American machine shop to receive the imported Turkish parts in order to deceive the Government into believing that an appropriate portion of the parts' manufacture took place in the United States at Robinson's machine shop and that the parts were built to contract specifications.

10.     Because of Relator's position as Quality Manager and his knowledge of Robinson's business practices, Relator determined that Robinson's fraudulent manufacturing scheme was not relegated to one contract and that it could not be explained away as an innocent, isolated instance. In fact, Maven and Robinson's fraudulent scheme extended to most or all of Maven's DoD military supply contracts. Maven has been providing Turkish parts to the government for many years, potentially twenty years or more, and the arrangement with Robinson was just the most recent in a long line of contractual arrangements with numerous subcontractors. Maven's relationship with Faymer, the Turkish supplier of Turkish materials, pre-dates Maven's relationship with Robinson and likely stretches back that entire period. Thus, it was Maven who orchestrated Robinson's import and delivery of Turkish parts for U.S. military use.

11.     As a result of several quality issues discovered during the inspection process across several contracts, the Government suspended Robinson in April 2014.

3

12.     Relator was fired shortly thereafter on April 4, 2014. At the time of his firing, Relator was handling the quality assurance for around 50 supply contracts[1] that Robinson had with Maven to supply military parts to the DoD. *See* Exhibit A.

13.     Relator learned that as a result of its fraudulent arrangements with Robinson and Faymer to deliver finished but nonconforming Turkish parts to the military, Maven was able to avoid domestic manufacturing costs and provide the Government with the lowest bid in Government solicitations for military parts. Through this scheme, Maven has fraudulently induced the Government to award Maven numerous DoD military supply contracts.

14.     Robinson was involved in this fraudulent scheme with Maven for approximately five years, from 2009 to 2014, when Robinson was finally suspended by the Government.

15.     Based on Relator's knowledge, Maven's fraudulent scheme extends from at least 1998 to the present.

## II.     JURISDICTION AND VENUE

16.     This court has subject-matter jurisdiction because Relator brings claims that arise under federal law pursuant to the False Claims Act, 31 U.S.C. § 3729–3733.

17.     The jurisdictional provision of the False Claims Act provides that:

> Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred.

31 U.S.C. § 3732(a).

18.     Defendants are subject to general personal jurisdiction and specific personal jurisdiction of this Court because Defendants engage in business in Illinois and because Relator

---

[1] The supply contracts referenced herein refer to the broad array of contracts that Maven had with the Government to supply various parts, which came in the form of Indefinite Delivery Contracts, Indefinite Delivery Purchase Order Contracts, Purchase Orders, and other contractual agreements to deliver supplies to the Government, as explained in more detail below.

brings this civil action pursuant to 31 U.S.C. § 3730 and seeks claims for relief on behalf of the United States for multiple violations of 31 U.S.C. §3729.

19.     Venue is proper in Central District of Illinois pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in Illinois and because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants, some of which occurred in Illinois.

### III.     ORIGINAL SOURCE

20.     There are no bars to this action under 31 U.S.C. § 3730(e).

21.     To the extent that any allegations or transactions herein have been publicly disclosed, Relator voluntary disclosed to the Government the information on which his allegations or transactions in his claims are based prior to the public disclosure.

22.     To the extent that any allegations or transactions herein have been publicly disclosed, Relator is an original source of the information in this action as defined in 31 U.S.C. § 3730(e)(4)(B).

23.     Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator voluntarily provided this information to the United States in his voluntary Pre-Filing Disclosure Statement on August 21, 2018, before the filing of his Original Complaint and concurrent submission of this Original Disclosure.

24.     As required by 31 U.S.C. § 3730(b), Relator is hereby disclosing to the Attorney General of the United States and the United States Attorney for the Central District of Illinois all material evidence and information in this Original Disclosure Statement, including documentary evidence in Relator's possession, concurrently with the filing of this Original Complaint.

## IV.   PARTIES

A.   **Relator Danny Cavic**

25.   Danny (Dusko) Cavic is a resident of Placentia, California.

26.   During his career as a machine shop owner and manufacturer of parts, Cavic became familiar with federal rules, regulations, and contract requirements pertaining to the manufacture of military parts under Government contracts.

27.   Cavic was the long-time owner and manager of D.C. Precision Co., which manufactures various type of parts. He started the company in 1979 in Santa Ana, California. Since the 1980s, D.C. Precision Co. has supplied parts for the aerospace, defense, medical, and commercial industries. As owner of the small business, Cavic acted as the President, estimator, quality control manager, programmer, operator, tool designer, and engineer of the company. In 2013, he was forced to sell the company when he was diagnosed with throat cancer.

28.   In early February 2014, Cavic entered into contract negotiations with Kavita Dawson, the President of Maven Engineering Corporation ("Maven"), for the position of Quality Manager Inspector. Cavic also communicated with Don Robinson ("Don Robinson"), the President of Robinson Manufacturing Inc. ("Robinson"), regarding this employment opportunity with Maven.

29.   Dawson and Don Robinson expressed interest in employing Cavic because Cavic had previous experience dealing with Government DCMA inspectors and the inspection process. On or about February 10, 2014, Cavic was orally hired by both Maven and Robinson, both of whom agreed to pay him $2,000 per week, later modified to $1,200 per week plus sales-based commissions. In retrospect, the commissions were unusual for a quality control manager,

6

apparently reflecting Maven's desire, as described below, that Cavic would influence the inspection process by altering certification paperwork.

30.     While Cavic initially believed that he was negotiating with Dawson and Don Robinson to work for Maven, on February 21, 2014, Cavic was presented with a revised written employment contract from Robinson instead. Relator signed the employment contract, along with Don Robinson, who signed on behalf of Robinson.

31.     Cavic was given the position of Quality Control Manager. He had responsibility for Robinson's military business division, including quoting, planning, contract review, purchasing and Quality Control/Inspection.

32.     During this time frame, Robinson's military business only had two customers: Maven and Conquest Machine, Inc.

33.     After the Government suspended Robinson from performing under any Government contract in April 2014, Robinson terminated Cavic.

34.     Cavic next took a job as Quality /Production Control Manager for Cole Instrument Corporation in Santa Ana, California, which delivers military aircraft parts to the Government. Cavic later accepted a job as President of Geddes Manufacturing ("Geddes") in Orange County, California, where he worked from August 2016 to May 2018. Initially, Geddes manufactured guidance missile parts. The company had been owned by a South Korean engineer and produced parts for the South Korean government.

**B.**     **Defendants**

**1.**     **Maven Engineering Corporation**

35.     Defendant Maven Engineering Corporation ("Maven") is a Maryland-based corporation that was founded in 1946. Maven has a 70-year history of supplying aftermarket and original equipment spare parts.

36.     Maven has numerous contracts with the Department of Defense ("DoD") to supply a broad array of military parts and components. Maven supplies to the Government, among other items, the following:

(1)     Airframe parts for military planes and helicopters, including structural supports, panels, hinges, aircraft skins, flaps, fairing, and fittings;

(2)     MS, NAS, and AN military hardware and fasteners, including rivets, blots, screws, gaskets, nuts, and several other types of hardware;

(3)     Aircraft kits for repairing and overhauling aircraft engines, which are supplied to maintenance facilities;

(4)     Missile components, including parts for the HAWK and PATRIOT missile systems;

(5)     Naval structural components for repair and maintenance of navy vessels, such as launchers, lockers, cables, sensors, valves, insulation panels, fiberglass, and paint;

(6)     Engine parts, including bearings, fuel injectors, gaskets, hydraulic hoses, pistons, radiators, and valves;

(7)     Engine bearings for aircraft, tanks, and Navy vessel;

(8)     Turbochargers;

(9)     Avionics for a wide variety of U.S. made military aircraft, including altimeters, air speed indicators, automatic direction finders (ADF), circuit card assemblies, fiber optic cables, receivers, and transmitters;

(10)    Electrical components, including adapters, cable assemblies, connectors, contactors, relays, generators, switches, and other electrical components;

(11)  Ground support equipment, including hoists, slings, maintenance stands, bearing cup pullers, trailers, trolleys, and tow bars;

(12)  Components for military weapons and training exercises, such as breech bolts, firing attachments, flash suppressors, cartridges, firing pins, and firing hammers;

(13)  Parts for Armed Personnel Carriers (i.e., tanks), such as clutches, control assemblies, gaskets, shock absorbers, speedometer adapters and torsion bars.

37.    Maven either manufacturers these parts, acts as an authorized distributor on behalf of other part makers and manufacturers, or outsources the manufacturing of these parts to other parts makers.

38.    Maven is incorporated in the state of Maryland as Maven Engineering Corporation. Maven's corporate headquarters are located at 15944 Derwood Road, Rockville, MD 20855. The registered agent on file with the Maryland Secretary of State is A. Howard Metro with McMillan Metro P.C., located at 7811 Montrose Road, Suite 400, Potomac, MD 20854.

39.    Maven's reports to the Government have revealed the following annual revenues figures: $750,000 in 2007, around $28 million in 2008, around $19 million in 2009, around $19 million in 2010, around $19 million in 2011, around $19 million in 2012, around $30 million in 2013, around $28 million in 2014, around $28 million in 2015, around $20 million in 2016, and around $20 million in 2017.

40.    While Maven claims in advertisements that it offers build-to-print manufacturing at its West Coast facility in Orange County, California, Maven has longstanding relationships with parts suppliers in Turkey and other countries under which it imports inexpensive foreign parts rather than manufacturing parts in-house.

9

## 2.    Kavita Dawson

41.    Kavita Dawson became President of Maven in 1992, after completing her education and working from 1982 to 1992 at Beers + Cutler (now named Baker Tilly), which provides business services including accounting, auditing, and tax services.

42.    Dawson is responsible for sales, business development, marketing, quality control and operations for Maven. During the 1990s, Dawson was also employed at Comptech Corporation, which was owned or partially owned by Maven. Dawson directed all conduct attributed to Maven in this disclosure.

43.    Dawson owns and operates Maven and makes all important day-to-day decisions. As described below, Dawson hired Relator and directed his work. All of the conduct described below as Maven's conduct was directed and/or carried out by Dawson.

## 3.    Robinson MFG., Inc. (Robinson Manufacturing, Inc.)

44.    Robinson Manufacturing, Inc. ("Robinson") is incorporated in the state of California as Robinson MFG., Inc.[2] Robinson Manufacturing, Inc. is the company's dba or trade name.

45.    Robinson's corporate headquarters are located at 1136 S. Richfield Road, Placentia, CA 92870. The registered agent on file with the California Secretary of State is Donald Robinson, located at 1136 S. Richfield Road, Placentia, CA 92870.

46.    Unless otherwise specified, Maven Engineering Corporation, Kavita Dawson, and Robinson Manufacturing, Inc. will be collectively referred to herein as "Defendants.

---

[2] Robinson MFG., Inc. is referred to in this complaint as Robinson Manufacturing, Inc. (and shortened to "Robinson"), as it is the name listed in Government supply contracts and the name it uses in its letterhead.

## V. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

47.      Any and all acts alleged herein to have been committed by the Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

## VI. STATUTORY, REGULATORY AND CONTRACTUAL BACKGROUND

### A. Overview of DoD and DLA

48.      Maven's contracts with the Department of Defense are handled through the Defense Logistics Agency ("DLA"). The Defense Logistics Agency is the Department of Defense's logistics combat support agency. The DLA provides worldwide logistics support in both peacetime and wartime to the military services, as well as to several civilian agencies and foreign countries.

49.      The DoD, through the DLA, sends to Maven requests to purchase parts through either a "Purchase Order"[3] or a "Delivery Order" (when, for example, purchasing supplies under an existing indefinite-delivery contract).

50.      In fulfilling DoD supply requests, Maven must abide by the pertinent statutory, regulatory, and contractual requirements governing its supply contracts with the Government. The regulations that apply to Maven's DoD supply contracts are contained in the Federal Acquisition Regulations ("FAR"), the Defense Federal Acquisition Regulation Supplement ("DFARS"), and the Defense Logistic Acquisition Directive ("DLAD"), as explained in detail below.

---

[3] The Government often uses DD Form 1155, "Order for Supplies or Services", as the purchase order.

11

B.      **Federal Regulations Governing the Acquisition of Supplies**

51.      The Federal Government issues regulations that govern federal agency-wide acquisitions of supplies and services in the Federal Acquisition Regulations (FAR). FAR 1.104. These regulations are codified in Title 48 of the Code of Federal Regulations. FAR 1.303. The FAR and CFR regulations are parallel in format, arrangement, and numbering. For example, FAR 25.100(b) is codified in the Code of Federal Regulations as 48 C.F.R. § 25.100(b).

52.      A federal agency may supplement the agency-wide FAR regulations—and may also deviate from the FAR regulations—through the promulgation of its own agency-specific regulations. FAR 1.301; FAR 1.402.

53.      The Department of Defense (DoD) implements and supplements the requirements of the Federal Acquisition Regulations (FAR)—and in certain instances deviates from these requirements—through regulations it promulgates in the Defense Federal Acquisition Regulation Supplement (DFARS). The DFARS contains:

(i)       Requirements of law;

(ii)      DoD-wide policies;

(iii)     Delegations of FAR authorities;

(iv)      Deviations from FAR requirements; and

(v)       Policies/procedures that have a significant effect beyond the internal operating procedures of DoD or a significant cost or administrative impact on contractors or offerors;

DFARS 201.301(a)(1). All of these apply to DoD contracts. *Id.*

54.      The Defense Logistics Agency (DLA) implements and supplements the requirements of the Federal Acquisition Regulations (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS)—and in certain instances deviates from the requirements

contained therein—through regulations it promulgates in the Defense Logistics Acquisition Directive (DLAD). DLAD 1.301. The DLAD contains:

(i)     Clear requirements and procedures of law;

(ii)    Mandatory DLA-wide policy;

(iii)   Deviations from higher level regulations;

(iv)    Designations or delegations of contracting authority; and

DLAD 1.301(a)(1). All of these apply to DLA contracts. *Id.*

C.      **Material Contractual Requirements**

55.     Maven's supply contracts incorporate by reference several FAR, DFAR, and DLAD clauses. This means that the supply contracts simply list the FAR, DFAR, or DLAD regulation clause number and its caption (*e.g.* 252.225-7001 BUY AMERICAN ACT AND BALANCE OF PAYMENT PROGRAM (JUNE 2008) DFARS) in the contract, but not the full text of the regulation clause that is referenced. Per federal regulations, the full text of the clause that the regulation number references is expressly made part of the contract (*i.e.* incorporated) and is binding upon contractors:

> CLAUSE INCORPORATED BY REFERENCE (FEB 1998)
>
> This contract incorporates one or more clauses by reference, with the same force and effects as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/theses address(es):

48 C.F.R. § 52.252-2; FAR 52.252-2.

56.     Maven's supply contracts incorporate the following material contractual clauses, which also reference other material contractual clauses, that Maven and its subcontractors must adhere to and comply with the below directives.

13

**1.     Compliance with Inspection/Testing Protocols and Supply Specifications**

57.     Maven's supply contracts require that the supplies it furnishes to the Government be subjected to the necessary testing to ensure that is complies with the specifications and terms of the contract:

PRODUCT VERIFICATION TESTING

\*\*\*

> (b)     The Contractor is responsible for ensuring that supplies are manufactured, produced, and subjected to all tests required by applicable material specifications/drawings specified in the purchase description of the contract.

\*\*\*

DLAD 52.246-9004(b).

58.     As to the testing equipment that is to be used to confirm compliance, Maven's supply contracts require Maven to:

> \*\*\* ensure that the gauges and other measuring and testing equipment, used in determining whether the supplies presented to the Government for acceptance under this contract fully conform to specified technical requirements, are calibrated in accordance with the International Organization for Standardization (ISO) 10012:2003 or American National Standards Institute (ANSI)/National Conferences of Standards Laboratories (NCSL) Z540.3 (R2013).

DLAD 52.246-9003.

59.     Maven's supply contracts further contain strict requirements pertaining to the Government inspection process. In pertinent part, Maven is required to submit to the Government for acceptance only those supplies that have been properly inspected in conformity with the contract requirements:

INSPECTION OF SUPPLIES—FIXED-PRICE (AUG 1996)

\*\*\*

(a)    The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and **shall tender to the Government for acceptance only supplies that have been inspected in accordance with contract requirements**. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long as the contract requires.

      \*\*\*

(i)    (1)    If this contract provides for the performance of Government quality assurance at source, and if requested by the Government, the Contractor shall furnish advance notification of the time—

        (i)    When Contractor inspection or tests will be performed in accordance with the terms and conditions of the contract; and

        (ii)    When the supplies will be ready for Government inspection.

(j)    \*\*\* Government failure to inspect and accept or reject the supplies shall not relieve the Contractor from responsibility, nor impose liability on the Government, for nonconforming supplies.

(k)    Inspections and tests by the Government **do not relieve the Contractor of responsibility for defects or other failures to meet contract requirements discovered before acceptance.** Acceptance shall be conclusive, exceptfor latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

(l)    If acceptance is not conclusive for any of the reasons in paragraph (k) hereof, the Government, **in addition to any other rights and remedies provided at law, or under other provisions of this contract**, shall have the right to require the Contractor (1) at no increase in contract price, to correct or replace the defective or nonconforming supplies at the original point of delivery or at the Contractor's plant at the Contracting Officer's election, and in accordance with a reasonable delivery schedule as may be agreed upon between the Contractor and the Contracting Officer; provided, that the Contracting Officer may require a reduction in contract price if the Contractor fails to meet such delivery schedule, or within a reasonable time after receipt by the Contractor of notice of defects or nonconformance, to repay such portion of the contract as is equitable under the circumstances if the Contracting Officer elects not to require correction or replacement. When supplies are returned to the Contractor,

> the Contractor shall bear the transportation cost from the original point of delivery to the Contractor's plant and return to the original point when that point is not the Contractor's plant. If the Contractor fails to perform or act as required in (1) or (2) above and does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure, the Government shall have the right by contract or otherwise to replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby.

48 C.F.R. § 52.246-2 (emphasis added); FAR 52.246-2. As shown above, this clause explicitly provides that, even if the Government fails to inspect the supplies, Maven must still ensure that the supplies meet the contractual specifications and requirements. 48 C.F.R. § 52.246-2(j); FAR 52.246-2(j). And even if the Government inspects and tests the supplies, Maven is responsible for any defects or other failures to meet the contractual requirements that it discovers before acceptance—meaning that if Maven knows that its supplies fail to meet contractual requirements, it must inform the Government and take responsibility for the nonconforming supplies. 48 C.F.R. § 52.246-2(k); FAR 52.246-2(k). Furthermore, the clause provides that even if the Government accepts defective supplies after inspection and testing, acceptance is vitiated by fraud. *Id.*; *Id.* Lastly, besides being able to pursue the remedies listed in the clause—to repair or replace the supplies or repay the Government if the Government elects not to require the contractor to repair or replace the supplies—the clause makes it explicit that the Government may also pursue any other rights and remedies provided for by law. 48 C.F.R. § 52.246-2(l); FAR 52.246-2(l).

### 2. Place of Inspection and Acceptance Requirements

60. Federal regulations provide that "quality assurance on subcontracted supplies shall be performed only when required in the Government's interest," such was when inspection at source is required. 48 C.F.R. § 46.405; FAR 46.405.

61.　　Federal regulations also provide that: "When a contract provides for Government contract quality assurance at source, the **place of manufacture** (if different from the prime contractor) will be designated for each contract line or subline item." DLAD 46.503(c) (emphasis added).

62.　　Because the Government found it to be in its best interest, Maven's supply contracts require the inspection of supplies and acceptance by the Government to be conducted at the point of origin. DFARS 252.246-9008(a).

63.　　Because the purported place of manufacture was to occur at Robinson, Maven elected for inspection—and acceptance—to take place at Robinson's facility at 1136 S Richfield Rd, Placentia CA 92870.

64.　　Federal regulations explicitly provide that Government inspection and acceptance of subcontracted work does not "does not relieve the prime contractor of any responsibilities under the contract." 48 C.F.R. § 46.405; FAR 46.405.

**3.　　Certificate of Conformance**

65.　　Maven's supply contracts require that Maven include a Certificate of Conformance when it ships supplies to the Government. FAR 52.246-15(a). The Certificate of Conformance requires Maven to certify the following:

> I certify that on [date], the [Maven Engineering Corporation] furnished the supplies or services called for by Contract No. ___ *** in accordance with all applicable requirements. I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on this or on the attached acceptance document.

> Date of Execution: _____

> Signature: _____

17

Title: _____

48 CFR 52.246-15(a); FAR 52.246-15(a). The process of how Maven is required to submit this Certificate of Conformance is explained below.

### 4.  Material Inspection Report and Receiving Report (WAWF RR)

66.  Maven's supply contracts require Maven, at the time that it delivers supplies to the Government, to

> prepare and furnish to the Government a **material inspection and receiving report** in the manner and to the extent required by Appendix F, Material Inspection and Receiving Report, of the Defense FAR Supplement.

DFARS 252.246-7000(a) (emphasis added). This material inspection and receiving report is generally submitted electronically, as explained below.

67.  Appendix F to the DFARS "contains procedures and instructions for the use, preparation, and distribution of the Wide Area WorkFlow (WAWF) Receiving Report (RR)"— referred to commonly by its abbreviation "WAWF RR." DFARS, Appendix F, at F-1.

68.  The WAWF RR is an electronic form that is equivalent to the DD Form 250, the physical version of the Material Inspection and Receiving Report that is referenced above. DFARS, Appendix F, at F-1. Electronic submission of the WAWF RR fulfills the requirement of submitting the Material Inspection and Receiving Report (DD Form 250). DFARS 252.246-7000(b).

69.  The WAWF RR is a multi-purpose report used—

(1)  To provide evidence of Government contract quality assurance at origin or destination;

(2)  To provide evidence of acceptance at origin, destination, or other;

(3)  For packing lists;

(4)  For receiving;

18

(5)     For shipping

(6)     As a contractor invoice . . . ; and

(7)     As commercial invoice support.

DFARS, Appendix F, Part 1, F-103(a), at F-1 to F-2.

70.     Maven is required to create a WAWF RR and complete it in the Wide Area Workflow Receipt and Acceptance (WAWF-RA), DLAD 52.246-9019, which is a secure, Web-based system for electronic invoicing, receipt and acceptance.

71.     In completing the WAWF RR, Maven is required to

▪     enter the 13-position alpha-numeric basic Procurement Instrument Identifier (PIID) of the contract or the 13-character order number. DFARS, Appendix F, Part 3, F-301(b)(1), at F-7. While the contract number may be omitted; Maven may choose to enter the contract number in addition to the 13-character order number. *Id.*;

▪     include its Prime Contractor (Prime CAGE) Code number. DFARS, Appendix F, Part 3, F-301(b)(7), at F-9; and

▪     include the national stock number (NSN) or noncatalog number of the part that it is supplying in the Stock Part Number field. DFARS, Appendix F, Part 3, F-301(b)(15), at F-10.

72.     In the Contract Quality Assurance (CQA) field, the words "conform to contract" appear. DFARS, Appendix F, Part 3, F-301(b)(20)(i), at F-13 to F-14. If Maven takes any exception to this representation, Maven is required to "[e]nter notes taking exception in" the "Misc. Info Tab comment field or on attached supporting documents . . . ." *Id.*

73.     Maven is further required to electronically execute any Certificates of Conformance "by including the appropriate indicator in the electronic transaction rather than through the inclusion or attachment of the text or certificate." DFARS, Appendix F, F-301(20)(iii), at F-13 to F-14.

74.     Once Maven completes the WAWF RR, the Government representative responsible for acceptance must accept the supplies. Once the Government Representative has accepted the supplies, the Government representative's electronic signature will appear on the Receiving Report. DLAD 52.246-9019(a).

75.     In addition to creating the WAWF RR via the WAWF-RA, Maven is required to:

include hard copies of the Receiving Report (which includes an electronic signature of the Government representative responsible for acceptance if acceptance is at origin) in the exterior and interior shipping documentation.

DLAD 52.246-9019(b).

76.     Maven can also direct its subcontractors to prepare and submit the WAWF RR on its behalf. DFARS, Appendix F, Part 3, F-301(a)(2), at F-7.

**5.      Billing Requirements**

77.     Maven's supply contracts require that Maven electronically submit *payment requests*—"claims" in FCA parlance—to the Government using the WAWF system:

ELECTRONIC SUBMISSION OF PAYMENT REQUESTS AND RECEIVING REPORTS

\*\*\*

(b)     Except as otherwise provided in paragraph (c) of this clause, the Contractor shall submit payment requests and receiving reports using WAWF . . . .

DFARS 252.232-7003(b).

78.     The "The WAWF system is the method to electronically process vendor **payment requests and receiving reports**, as authorized by DFARS 252.232-7003." DFARS 252.232-7006(b) (emphasis added).

79.     When submitting payment requests, Maven is required to include the "appropriate contract line item and subline item descriptions of the . . . supplies delivered, unit price/cost per

unit, fee (if applicable), **and all relevant back-up documentation, as defined in DFARS Appendix F (*e.g.* timesheets) in support of each payment request.** DFARS 252.232-7006(f)(4) (emphasis added).

80.     As explained above, Appendix F requires Maven to electronically execute any Certificates of Conformance "by including the appropriate indicator in the electronic transaction rather than through the inclusion or attachment of the text or certificate." DFARS, Appendix F, F-301 Preparation instructions, at F-13 to F-14. A signed Certificate of Conformance which contains Maven's signature is further require to be "attached to or included on the top copy of the inspection or receiving report distributed to the payment office." FAR 52.246-15(b).

81.     Therefore, when billing the Government, Maven's payment requests are accompanied by a Certificate of Conformance, wherein Maven represents to the Government that it is in compliance with all statutory, regulatory, and contractual requirements and that the supplies it delivers conform to the contract requirements and specifications. *See* 48 CFR § 52.246-15(a); FAR 52.246-15(a).

**D.     Buy American Act**

82.     Maven's supply contracts are required to comply with the Buy American Act, 41 U.S.C § 8301–8305, and the Buy American Act regulations promulgated in the FAR, DFARS, and DLAD.

**1.     Federal Law**

83.     The Buy American Act was enacted in 1933 to foster and protect American industries and workers.[4] The Act requires, with certain exceptions, that only articles, materials,

_____

[4] Summary Report of DoD Compliance With the Berry Amendment and the Buy American Act, Report No. DODIG-2018-070, 2 (February 6, 2018).