E-FILED
Tuesday, 28 August, 2018  04:00:34 PM
Clerk, U.S. District Court, ILCD

and supplies that have been mined, produced, or manufactured in the United States are to be used

to fulfill Federal procurement and construction contracts.

84.     The Buy American Act provides, in pertinent part, that:

Only unmanufactured articles, materials, and supplies that have been mined or produced in the United States, and only manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States, shall be acquired for public use unless the head of the department or independent establishment concerned determines their acquisition to be inconsistent with the public interest or their cost to be unreasonable.

41 U.S.C § 8302(a)(1).

**2.      Federal Regulations**

85.     Federal regulation provide that the Buy American Act applies to supplies acquired

for use in the United States, including under DoD supply contracts, if

(a)     The supply contract exceeds the micro-threshold purchase; or

(b)     The supply portion of the contract for services that involves the furnishing of supplies (e.g., lease) exceeds the micro-threshold purchase.

48 C.F.R. § 25.100(b); FAR 25.100(b). Stated more simply, the Act applies to Government

supply contracts that exceed the micro-purchase (small purchase) threshold. The micro-purchase

threshold was $3,000 for Fiscal Year 2015 and $3,500 for Fiscal Year 2016. 80 FR 38293,

38293–38294 (July 2, 2015).

86.     If a Government supply contract falls under the purview of the Buy American

Act, a contractor may only supply **domestic end products** to the Government. 48 C.F.R. §

25.102; FAR 25.102.

87.     The FAR defines a domestic end product using a two-part test. To qualify as a

domestic end product:

(1)     The article must be manufactured in the United States; and

(2)     The cost of domestic components must exceed 50% of the cost of all the components.

48 C.F.R. § 225.101(a); FAR 25.101(a).

88.     The DOD use a slightly different two-part test than that provided for in the FAR.

For the DoD, to qualify as a domestic end product:

(1)     The end product must be manufactured in the United States; and

(2)     The cost of its U.S. and qualifying country components must exceed 50% of the cost of all the components.

48 C.F.R. § 225.101(a); DFARS 225.101(a)[5].

89.     The test is applied to end products only and not to individual components.

DFARS 225.101(a)(i).

90.     A component is defined as "an article, material, or supply incorporated directly into an end product." 48 C.F.R. § 25.003; DFARS 251.225-7001(a)(2).

91.     Maven's supply contracts, which incorporate by reference the following DFARS contract clause, further refine the definition of a domestic end product:

**BUY AMERICA ACT AND BALANCE OF PAYMENTS PROGRAM.**

(b)     *Definitions*. As used in this clause—

***

(3)     "Domestic end product" means—

(i)     An unmanufactured end product that has been mined or produced in the United States; or

(ii)    An end product manufactured in the United States if—

_____

[5] The list of qualifying countries are: Australia, Austria, Belgium, Canada, Czech Republic, Denmark, Egypt, Estonia, Finland, France, Germany, Greece, Israel, Italy, Japan, Latvia, Luxembourg, Netherlands, Norway, Poland, Portugal, Slovenia, Spain, Sweden, Switzerland, Turkey, United Kingdom of Great Britain and Northern Ireland. 48 C.F.R. § 225.003(10); DFARS 225.003(10).

(A)    The cost of its qualifying country components and its components that are mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. The cost of components includes transportation costs to the place of incorporation into the end product and U.S. duty (whether or not a duty free entry certificate is issued). Scrap generated, collected, and prepared for processing in the United States is considered domestic. A component is considered to have been mined, produced, or manufactured in the United States (regardless of its sources in fact) if the end product in which it is incorporated is manufactured in the United States and the component is of a class or kind which the Government has determined that—

    (1)    Sufficient and reasonably available commercial quantities or a satisfactory quality are not mined, produced, or manufactured in the United States; or

    (2)    It is inconsistent with the public interest to apply the restrictions of the Buy American Act; or

(B)    The end product is a COTS item.

DFARS 252.225-7001(a)(3).

**3.**    **Certifications**

92.    Maven's supply contracts incorporate by reference the following clause, which requires Maven to certify its compliance with the Buy American Act:

**BUY AMERICAN ACT—BALANCE OF PAYMENTS PROGRAM CERTIFICATE (JAN 2009)**

\*\*\*

(c)    *Certifications and identification of country of origin.*

(1)    For all line items subject to the Buy American Act and Balance of Payments Program clause of this solicitation, the offeror certifies that–

(i)     Each end product, except those listed in paragraphs (c)(2) or (3) of this provision, is a **domestic end product**; and

(ii)    For end products other than COTS items, components of unknown origin are considered to have been mined, produced or manufactured outside the United States or a qualifying country.

(2)    The offeror certifies that the following end products are qualifying country end products:

Line Item Number        Country of Origin (If known)

——————————     ——————————————

(3)    The following end products are other foreign end products, including end products manufactured in the United States that do not qualify as domestic end products, i.e., an end product that is not a COTS item and does not meet the component test in paragraph (ii) of the definition of "domestic end product":

Line Item Number        Country of Origin (If known)

——————————     ——————————————

DFARS 252.225-7000 (emphasis added).

## VII.    DEFENDANTS' SCHEME TO DEFRAUD THE GOVERNMENT

93.     After initially negotiating with Kavita Dawson and Don Robinson to work for Maven, Relator was ultimately hired by Robinson in February 2014 as the company's Quality Control Manager and was put in charge of Robinson's military business division.

94.     As Maven's subcontractor, Robinson "manufactures" military parts to fulfill Maven's supply contracts with the DoD.

95.     Based on his experience working in the industry, it became readily apparent to Relator as his employment with Robinson unfolded that Robinson did not have the capability to

manufacture military parts that met DoD contract specifications and requirements. Relator learned that Robinson's primary experience was in the manufacture of commercial, construction materials for homes and buildings—not military parts.

96.     In fact, at no time did Robinson attempt to manufacture nor did it actually manufacture any parts. The vast majority of parts that Robinson supplied were ones that it had obtained in a completely finished stage, requiring no manufacturing at all. A tiny proportion of parts that Robinson obtained were about 95% complete; all that was left was for Robinson to apply a coat of paint or do some anodizing or plating work in order for Robinson to claim that it had "manufactured" the part.

97.     When Relator arrived at Robinson, he discovered that Robinson did not possess a coordinate-measuring machine (CMM) or other proper testing equipment necessary to determine whether any of the parts met the pertinent dimensional requirements or other specifications required under Maven's various DoD contracts. This glaring omission raised Relator's alarm: he saw that Robinson had no intention of becoming a legitimate manufacturer or actually testing the parts it procured. As a result, Relator brought his own micrometer to test the parts, and with this instrument he was able to determine that some of the parts failed the basic dimensions specifications in government contracts. Other specification failures discovered later were harder to detect, such as whether a part had sufficient hardness. To explain further, the conformance issues often involved either the quality of the raw material or dimensional problems associated with the quality of the machining.

98.     Relator learned that Robinson did not, and could not, act alone. As it turned out, it was Maven and Kavita Dawson—whom Relator had first been in contact with to work for Maven—who were responsible for Robinson's failures. Relator discovered that Maven had

concocted an extensive scheme whereby Turkish materials, parts, and components were imported by either Maven or Robinson and then subsequently delivered to the Government under Maven's supply contract with the DoD. Specifically, Relator learned that at Maven's instruction, Robinson contracted with a Turkish company, Faymer, to supply Robinson with materials, parts, and components.

99.    Maven had an enormous economic incentive to import parts that were in completely or almost completely finished condition: avoiding the costs of domestic manufacture. With Robinson's help, Maven chose to avoid domestic manufacture entirely. However, these actions violated anti-dumping and made-in-America laws, and Robinson and Maven knew this.

100.    As explained above, Maven's DoD contracts required that the parts it furnished to the Government had to be "manufactured" domestically to comply with the Buy American Act and also required that inspection had to occur at the place of manufacture. Because of this, Maven had to recruit a machine shop like Robinson to handle the import and, supposedly, to finish the manufacturing of the parts. The conspiracy was worth the risk for Robinson, which in 2009 was in a precarious financial position. It was also worth the risk for Maven, as it allowed Maven to incur substantial savings in the manufacture of military parts, obtain a higher profit margin, and undercut its competitors.

101.    To effectuate this scheme, Maven and Robinson entered into a silent partnership to deceive and misrepresent the real facts to the Government. First, Maven bid on and entered into Government contracts with the Defense Logistics Agency ("DLA"). In many instances, Maven falsely represented during the bidding process or when it accepted the contract that it would manufacture parts in the United States and in comply with the contract requirements—but

in reality, from the outset Maven had every intention of importing nonconforming parts from Turkey to fulfill these contracts.

102.    Once Maven entered into a supply contract with the Government, Maven would issue a Purchase Order to Robinson as the subcontractor, creating the expectation that Robinson would manufacture the parts on behalf of Maven. Then either Maven or Robinson would send a Purchase Order to a Turkish manufacturer / dealer, such as Faymer, who could produce the items at a discounted price, fully finished. As explained below, Relator would then furnish the Turkish parts to the Government for acceptance.

103.    The parts that Robinson procured from Turkey arrived in shipments of varying size, via ocean freight if the shipment were large, and via air freight for smaller shipments. The parts were packaged in boxes or pallets, depending on the size and quantity.

104.    The extent to which these imported Turkish materials, parts, and components required "manufacturing" to render them into the finished spare parts to be delivered varied somewhat, but the Turkish materials or components were generally in 99% finished condition right out of the box. The only "manufacturing" necessary was to paint the materials or components to arrive at a manufactured part. Maven falsely represented to the Government that these military parts were "manufactured" in America.

105.    As part of his duties as Quality Manager, Relator was in charge of preparing the military parts that Robinson had procured for Government DCMA inspection at Robinson's facility in California. More importantly to Maven and Robinson, Relator was tasked with getting the substandard Turkish parts accepted by the Government DMCA inspectors under Maven's supply contracts.

106.    The parts at issue were mostly small—the biggest was two to three feet in diameter. Relator would lay out samples of the Turkish parts for inspection in a large table and also include any paperwork and certifications that had accompanied the parts. Inspectors would physically inspect the parts and then focus on the certifications.

107.    In the military supply realm, certifications are prepared and presented to the Government to represent that a part meets certain dimensional, material, and quality specifications. Thus, these certifications are important because they contain representations as to whether the parts meet contractual specifications. For instance, were the parts made of stainless steel 304, the American standard? Were the parts composed of 20% nickel, 50% chrome as some contracts required? Were the parts heat treated? Did the proper entity certify to that representation? On rare occasions, DMCA would send a sample to an independent lab to check and verify that the parts met the pertinent contractual requirements, but for the most part inspectors could not identify potential problems based on visual inspection or any other examination onsite, but instead relied on certifications.

108.    On some occasions, Relator was able to observe that parts did not conform, but could be made to conform in a machine shop. Some parts composed of alloy steels were not heat-treated, for instance, but were required to be, and could have been heat-treated at a machine shop. This did not occur.

109.    The following is an example of a contract wherein Maven and Robinson, with the knowledge and cooperation of Kavita Dawson and Don Robinson, defrauded the Government.

110.    On September 12, 2012, the DoD and Maven entered into an Indefinite Delivery Purchase Order ("IDPO") Contract[6] (# SPEA47-12-D-5048) for the purchase of main landing

_____

[6] An indefinite delivery purchase order contract is a type of supply contract. Specifically:

gears (MLG)[7] in an amount not to exceed $150,000, or $6,500,000 for acquisitions conducted under Federal Acquisition Regulation (FAR) Subpart 13.5. Exhibit B, at 2, 15. The supply contract became effective on September 12, 2012 and was set to expire on September 11, 2013, with the option for the Government to extend the terms of the contract for an additional four option years. *Id.*

111.    Section B of the supply contract contains, among other items, the manufacturing and technical specifications with which Maven was required to comply in the manufacture of the gears. *See* Exhibit B, Section B, at 7–11. The supply contract contained ten engineering data requirements. For example, item 6 required "HEAT TREAT PER SAE AMS-H-6875 IN LIEU OF STP 54-01 5." *Id.* at 7.

112.    The supply contract incorporated several FAR, DRARS, and DLAD clauses into the contract, which also referenced other regulatory requirements. *See* Exhibit B, at 12–18.

113.    Robinson furnished the gears requested in this supply contract for inspection to the DCMA inspectors in 2014. However, Robinson knowingly failed to comply with the pertinent statutory, regulatory, and contractual requirements.

114.    First, as explained above, Robinson did not have the necessary measuring and testing equipment, as required per DLAD 52.246-9003. In fact, it had none at all. Because

---

An IDPO is a simplified acquisition procedure that **applies indefinite delivery contract concepts to simplified acquisitions.** An IDPO, when established by agreement of the contractor, establishes a standing quotation(s) from the contractor for a definite period for an indefinite quantity of supplies. However, when established as a contract, through performance undertaken by the contractor on a purchase order, an IDPO establishes a firm commitment that the contractor will perform under subsequent orders issued, at the purchase order price for a definite period for an indefinite quantity of supplies.

DLAD 13.390-1(91) (emphasis added).

[7] The exact item description in the contract is as follows:

STOP ASSY, SAFETY MLG BOGIE
LOCKHEED MARTIN CORP., CAGE 98897

Exhibit B, at 7.

Robinson did not have the necessary measuring and testing equipment, Robinson did not—and could not—submit the gears to testing to verify that the parts met the contractual specifications, as required per DLAD 52.246-9004(b). Further, inspection did not occur at the place of manufacture, because Robinson did nothing to manufacture these parts, in violation of DLAD 46.503(c).

115.   Hence, because Robinson did not conduct any testing at all, Robinson did not tender for acceptance to the Government DCMA inspectors (1) parts that were inspected in accordance with all contractual requirements; and (2) parts that were manufactured in conformity with applicable contract requirements, as required per FAR 52.246-2. Even further, these parts had a full set of Turkish certifications claiming that they met dimensional, material, and quality specifications as required by Maven's contract. Yet these Turkish certifications were bought and paid for and provided by private Turkish inspectors who, in Faymer's normal *modus operandus*—as Relator learned— did not concern themselves with accuracy. These parts were likely plagued, like most of Faymer's parts, by quality issues including materials and dimensional problems.

116.   As a result of its fraudulent conduct, Robinson knowingly submitted certifications that were false because Robinson knew that the parts it supplied did not comply with the Buy American Act and because Robinson failed to disclose the true origins of the components and parts used in the manufacture of the parts, as required per DFARS 252.225-7000.

117.   Robinson also knowingly submitted Certifications of Conformance that were false because the supplies did not meet the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a).

118.  Robinson initially included this false Certificate of Conformance in the WAWF RR (Material Inspection and Receiving Report) that it submitted to the Government at the time of the delivery of supplies to the Government. DFARS 252.246-7000(a).

119.  Robinson also included this false Certificate of Conformance in the claims for payment it submitted to the Government. DFARS 252.232-7006(f)(4); DFARS, Appendix F, F-301 Preparation instructions, at F-13 to F-14. In both cases, Robinson and Maven—which directed the whole enterprise—showed at least reckless disregard as to whether these certifications were correct. Robinson likely knew nothing about Faymer's practices before entering into business with Maven, and Maven knew Faymer's practices all too well.

120.  Robinson's and Maven's fraudulent conduct was not confined to this supply contact. During this time, Relator was working on at least 50 other purchase orders with Maven under government contracts.

121.  Among the Government contracts that Maven subcontracted to Robinson through purchase orders, and which Robinson fulfilled by importing parts from Faymer, were the following:

| Purchase Order | DLA/Maven Contract Number |
| --- | --- |
| 25264 | SPM4A6-11-C-0118 |
| 025517-0006 | SPM7LX-11-D-9025 |
| 26083 | SPM7MC-11-M 6029 |
| 27422 | SPM4A7-12-M-4910 |
| 28223 | SPM4A7-12-M-7621 |
| 29337 | SPM7M3-13-M-3269 |
| 30018 | SPE4A7-13-M-A582 |
| 30836 | SPE4A6-14-M-3955 |
| 30891 | SPE7M4-14-V-0693 |
| 31026 | SPE7L3-14-M-1403 |
| 032335-0004C | SPE4A7-15-D-0053 |
| 032951-02 | SPE7L-15-M-1931 |
| 033126-01 | SPE8EF-15-M-0536 |
| 033130-02 | SPE4A7-15- M-7111 |

Exhibit A, at 4 (Maven 00003). Among the purchase orders that Maven further issued to Robinson that used Turkish parts were the following:

| Purchase Order | DLA/Maven Contract Number |
| --- | --- |
| 026808-0001-0002 | SPMA6-122-D-5028 |
| 0228332-01 | SPM7MC-12-C-0012 |
| 028510-01 | SPM7M3-12-M-6771 |
| 030487-01 | SPE4A7-13-D-0125 |

Exhibit A, at 5–12 (Maven 00004–Maven 00010).

122.    Relator came to learn that Robinson's fraudulent conduct extended to all of these contracts.

123.    However, family-owned, and unqualified local machine shop that it was, Robinson was not the architect of this scheme—it was Maven. Relator learned that Robinson's president, Don Robinson, acted at the behest of Maven's president, Kavita Dawson, the true mastermind. Unbeknownst to the Government, Robinson was simply acting as the most recent in a line of "middle men" that Maven could utilize to supply the Government with substandard parts and to launder the true origin and state of the Turkish parts. It was Maven that had the longstanding business relationship with Faymer, and Maven that bid on DLA contracts with the intent to deliver Faymer-procured parts in knowing violation of the law and its contract.

124.    Further evidence that Maven was the ringleader of the scheme is that at several points during his employment, Dawson, and not Robinson, directed Relator to sign and submit false Certificates of Conformance to the Government during inspection in order to obtain Government acceptance of Robinson's manufactured parts.

125.    Dawson repeatedly asked Relator to find methods for gaining approval of the substandard parts by Government DCMA inspectors, instead of asking Relator to re-manufacture

33

the parts to contract specifications, which he could have done in some instances with the right equipment. Under this directive, there was not anything that Relator could do to make the Government inspectors accept the parts. All Relator could do was to present the inspection report and certifications to the inspectors, and it was ultimately up to the Government inspectors to accept or reject the parts. Ultimately, only a few parts were accepted by DCMA inspectors during Relator's tenure.

126.    At least one part that DCMA rejected at the time Cavic was working for Robinson was a tank wheel about two feet in diameter. DCMA later subjected the tank wheels to a battery of tests, and despite a certificate of conformance from Robinson and various certifications by Turkish suppliers, the parts failed all tests, including material and dimensional tests, Magnetic Particle Inspection tests, and others.

127.    Dawson also asked Relator to "clean" the certifications that accompanied the Turkish parts when they arrived into the United States and Robinson's facility. To "clean" a certification meant that Dawson was asking Relator, the Quality Control Manager, to "correct" the certifications from Turkey if there were errors or other problems with the paperwork. Relator refused to follow this directive.

128.    After expressing concerns over the quality of the military parts that were supplied by Robinson, Relator received a letter dated March 31, 2014 directly from Dawson requesting that Relator not submit any more parts for Government inspection. *See* Exhibit C. The letter purports to require Relator to find qualified shops to manufacture the parts according to contractual specifications. *Id.* In reality, Maven and Robinson's goal was to place the blame on Relator for not being successful in furthering their fraudulent scheme. Relator later learned from Mario Hurtado and Mike Zare, respectively the previous and successor Quality Control manager

for Robinson, that he was the sixth Quality Control Manager who had been hired that year. The previous Quality Control managers encountered the same problems as Relator and were not able to obtain Government acceptance of Robinson's parts.

129.    During this timeframe in February 2014, DCMA issued three "corrective action reports" (CARs") to Robinson regarding quality problems, which Relator answered under Maven's direction. DCMA issued another two CARs in early March 2014, one of which related to a CMM report. DCMA inspectors called Robinson to task not only for quality issues, but also stressed the need to hold inspections at the place of manufacture, which they apparently suspected was not Robinson. Exhibit C, at 1. Cavic answered those, too, again under Maven's direction. Finally, due to Robinson's continued poor performance under Maven's supply contracts, in early April 2014, the DLA decided to suspend and disqualify Robinson from performing under any Government contract.

130.    Relator was subsequently fired on April 4, 2014. When he was fired from Robinson, Relator had been working on at least 50 contracts that Robinson had with Maven to supply military parts to the DoD. Maven produced a list of these contracts in response to a subpoena from the California Labor Commissioner that was issued to Maven on November 8, 2014. *See* Exhibit A.

131.    Maven's fraudulent conduct began before it had been awarded a DoD contract. Due to Maven's longstanding relationship with Faymer and other unknown Turkish manufacturers and dealers, Maven was able to procure parts at a much lower price than its competitors. Due to this unfair advantage, Maven was able to low-ball bids, and thereby fraudulently induce the Government to award it numerous supply contracts. Maven represented that it would comply with the material statutory, regulatory, and contractual requirements

discussed throughout. All the while, Maven had in place a scheme to use Turkish parts to fulfill its supply contracts with the DoD.

132.   On April 26, 2014, Relator filed a Complaint with the Division of Labor Standards Enforcement ("DLSE") of the California Labor Commissioner's Office, Case No. 18-91062 LM, for unpaid wages, commission, interest and penalties. On December 12, 2016, the DLSE conducted a hearing regarding Relator's claims. During the hearing, Don Robinson falsely represented to the Labor Commissioner hearing officer that Robinson did not deliver any parts to DLA under any Government contracts during the time that Relator was employed with Robinson. On the same day, the hearing officer rendered a ruling in favor of Relator and ordered Robinson to pay Relator $3,120.

133.   Around July 2014, Relator filed a small claims complaint against Robinson for breach of contract. A trial date for the small claim was set for November 10, 2014. In retaliation for Relator's actions, on November 10, 2014, Robinson filed a complaint against Relator in the Superior Court of California, County of Orange, Case No. 30-2014-00755345. Robinson brought causes of action against Cavic for (1) negligence; (2) breach of contract; (3) fraud, and (4) Intentional Tort. On May 2, 2015, Relator filed a cross-complaint against Robinson and Maven for (1) breach of contract; (2) malicious prosecution; and (3) fraud. Maven was later dismissed from the cross-complaint and awarded attorney's costs. On May 22, 2017, the court dismissed the action.

134.   At the time this litigation was ongoing, Relator served upon the DCMA a subpoena around mid-2015 to obtain more information related to Maven's government contracts. DCMA did not respond in the litigation, but the subpoena did spur a government investigation. A

month after serving the subpoena, Relator spoke to a DLA Fraud Investigator and the FBI to report Maven and Robinson's fraud.

## VIII.   ACTIONABLE CONDUCT BY DEFENDANTS

### A.     The False Claims Act

135.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Cavic arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

136.    The FCA provides, in pertinent part, that any person who

(A)    knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim;

(C)    conspires to commit a violation of [the FCA]; . . .

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government;

is liable to the Government for a civil penalty of not less than $10,957 and not more than $21,916 for each such claim,[8] plus three times the amount of damages sustained by the Government because of the false and/or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

137.    The FCA defines "claim" as:

(A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

---

[8] *See* 82 FR 9131, 9133 (Feb. 3, 2017).

37

      (i)     is presented to an officer, employee, or agent of the United States; or

      (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

            (I)     provides or has provided any portion of the money or property requested or demanded; or

            (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. §3729(b)(2).

138.    The FCA allows any persons having knowledge of a false and/or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

139.    Based on these provisions, Relator Cavic, on his own behalf and on behalf of the United States, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**B.**    **Defendants' Violations of the False Claims Act**

    **1.**    **Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A))**

140.    From 1998 to the present, Maven knowingly presented or caused to be presented false and/or fraudulent claims for payment or approval to the DoD. From approximately 2009 to 2014, Robinson knowingly presented or caused to be presented false and/or fraudulent claims for payment or approval to the DoD.

141.    Specifically, the claims that were submitted to the Government under Maven's supply contracts, a representative sample of which is listed above, were false and/or fraudulent

because, contrary to Maven's certificates of conformance, and as Maven and Robinson knew or

should have known, and/or, in fact Maven directed:

- Robinson did not have the necessary measuring and testing equipment that was required to be properly calibrated, as required per DLAD 52.246-9003;

- Robinson did not subject the parts to testing to ensure that the parts met the contractual specifications, as required per DLAD 52.246-9004;

- Robinson did not furnish to the Government DCMA Inspectors supplies that had been inspected in accordance with contractual requirement as required per FAR 52.246-2;

- Maven and Robinson did not furnish the parts for inspection and acceptance to the Government at the source or origin as required under contract, as required per DLAD 46.503 (which defines this as the place of manufacture), because the actual place of manufacture was in Turkey, not at Robinson's facility;

- Maven and Robinson did not supply to the Government parts that complied with the Buy American Act, as required per DFARS 252.225-7000. Defendants failed to disclose the true origins of the components and parts used in the manufacture of the parts;

- Maven and Robinson did not supply to the Government parts that complied with the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a);

Maven included these false statements, false records, and certifications in its claims for payment,

rendering the claims false. Among the certifications were false Certificates of Conformance in

the electronic Material Inspection and Receiving Reports that Maven and/or Robinson is required

to furnish to the Government per DFARS 252.246-7000(a); and Certificates of Conformance

required to be included in the claims for payment under DFARS 252.232-7006(f)(4).

142.    Defendants also failed to disclose to the Government that the spare parts they

furnished were not and could not be inspected, violated the Buy American Act, and did not

conform to contractual specifications—all material omissions. These omissions created actionable half-truths under the *Universal Health Services v. Escobar*.

143.  These claims were materially false and fraudulent in that they had the potential to influence the government's decision to pay the claims and in fact did influence that decision. Defendants caused the United States to make payments for military parts that it would not have made had it known about Defendants' violation of the applicable statutory, regulatory, and contractual requirements. In fact, when DCMA detected repeated quality problems with Robinson's parts, it suspended Robinson as a government subcontractor. What DCMA and the Government at large did not know was that the quality issues with Robinson's parts were part of Maven's larger intentional scheme to buy and deliver nonconforming spare parts manufactured entirely in Turkey to the United States, with Robinson, and a line of similar subcontractors before Robinson, set up as the manufacturer delivering the final products.

144.  Indeed, Maven concealed that intent at the time it bid on the spare parts contracts at issue, fraudulently inducing the Government to enter contracts it would not have entered, had it known. Under the United States Supreme Court's ruling in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), each claim submitted under a contract that is procured by means of fraudulent inducement is tainted and false.

145.  Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which the United States contracted. The United States only pays for military parts that meet military specifications, as well as applicable material statutory, regulatory, and contractual requirements. The FAR, DFARS, and DLAD regulations and clauses support the materiality of these requirements. Had the government

known that Defendants did not comply with applicable statutes, regulations, and program instructions, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

146.  Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to DoD was a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**2. Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

147.  From 1998 to the present, the Maven knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim. From approximately 2009 to 2014, Robinson made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim. These false statements or false records consist of solicitations, bids, Certificates of Conformance, Buy American Act and Balance of Payments Program Certificates, other certifications, Material Inspection Report and Receiving Reports (either in paper or the electronic equivalent WAWF RR form), invoices, omissions, half-truths, and all other statements or records that falsely represented that

- The pertinent facility had the proper measuring and testing equipment and that it was properly calibrated, as required per DLAD 52.246-9003, when Robinson possessed no such equipment;

- The parts had been subjected to testing to ensure that the parts met the contractual specifications, as required per DLAD 52.246-9004, when they had not;

- The parts that were furnished to the Government DCMA Inspectors had been inspected in accordance with contractual requirements and other inspection requirements as required per FAR 52.246-2, when they had not;

▪ Maven and Robinson furnished the parts for inspection and acceptance to the Government at the place of manufacture, as required per DLAD 46.503, when they did not;

▪ The parts complied with the Buy American Act, as required per DFARS 252.225-7000, when they did not, and also failed to disclose the true origins of the components and parts used in the manufacture of the parts.

▪ The parts met the "quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packing, marking requirements, and physical item identification (part number)," as required per FAR 52.246-15(a), when they did not;

▪ The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificate of Conformance in the WAWF RR (Material Inspection and Receiving Report) that is required to be furnished to the Government per DFARS 252.246-7000(a), when they were not; and

▪ The parts were manufactured in compliance with all applicable statutory, regulatory, and contractual requirements in the Certificates of Conformance that were attached to the claims for payment that were submitted to the Government under Maven's supply contract (as Certificates of Conformance are required to be included in the claims for payment under DFARS 252.232-7006(f)(4)), when they were not.

Defendants' false statements and false records caused other entities to make false statements and false records as to the whether the military parts that Defendants furnished were in compliance with all applicable statutory, regulatory, and contractual requirements.

148.   Defendants made, or caused to be made, false representations and records regarding Defendants' compliance with the material statutory, regulatory, and contractual requirements applicable to their supply contracts. When submitting claims, Defendants expressly certified in Certificates of Conformance and in Buy American Act and Balance of Payments Program Certificates that they complied with all statutory, regulatory, and contractual requirements applicable to its supply contracts.

149.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which the United States contracted. The United States only pays for military parts that meet military specifications, as well as applicable material statutory, regulatory, and contractual requirements. Had the government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

150.    Defendants' creation of false records or false statements, and/or its causation of same, were a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**3.      Reverse False Claims (31 U.S.C. § 3729(a)(1)(G))**

151.    Defendants knowingly made, used, or caused to be made or used the following material false records or statements:

- Maven and Robinson represented that the pertinent facility had the proper measuring and testing equipment and that they were properly calibrated as required per DLAD 52.246, when Robinson did not even possess any testing equipment;

- Maven and Robinson represented that the parts were subjected to testing to ensure that the parts met the contractual specifications, as required per DLAD 52.246-9004, when they were not;

- Maven and Robinson represented that they furnished to the Government DCMA Inspectors parts that had been inspected in accordance with contractual requirement as required per FAR 52.246-2, when they did not;

- Maven and Robinson represented that inspection and acceptance occurred at the place of manufacture, as required per DLAD 46.503, when they did not because Robinson did nothing to manufacture these parts;